# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

ANGELIA KAY O'CONNELL,

        Plaintiff,

vs.

ANDREW SAUL, Commissioner of
Social Security,[1]

        Defendant.

No. 18-CV-2072-KEM

**MEMORANDUM OPINION
AND ORDER**

---

      Plaintiff Angelia Kay O'Connell seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her applications for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. O'Connell argues that the Administrative Law Judge (ALJ), Michael Lee Larner, erred in evaluating O'Connell's subjective complaints and weighing medical opinions, resulting in a flawed determination of O'Connell's residual functional capacity (RFC). She also argues that no medical evidence supports the ALJ's RFC determination and that the ALJ erred in relying on testimony from the vocational expert (VE) to conclude O'Connell could perform jobs that exist in significant numbers in the national economy. For the reasons that follow, I **affirm** the Commissioner's decision.

---

[1] Commissioner Andrew Saul is substituted for his predecessor in accordance with Federal Rule of Civil Procedure 25(d).

# I.    BACKGROUND[2]

O'Connell previously filed for disability in 2011 or 2012 based on carpal tunnel syndrome, but her application was denied.  AR 764.[3]  O'Connell worked full-time at Burger King from at least 2008 to 2011.  *See* AR 58, 279.  She worked as a cashier at different liquor or convenience stores from September 2011 to April 2012, October 2012 to December 2013, and March 2014 to August 2014.  AR 59, 279.  O'Connell reported in a form to the Social Security Administration in May 2015 that she was laid off from her cashier job in August 2014, and she testified at the hearing in September 2017 that she stopped working because she lived with her boyfriend/fiancé at the time, and he took care of her.  AR 59-60, 267, 278.  On March 23, 2015, O'Connell's boyfriend stabbed her fifteen times, injuring primarily her left side.  AR 61, 418-19.  One of the wounds punctured O'Connell's colon, and she underwent surgery to close the wounds.  AR 61, 426-27, 749.  Following her hospitalization, she lived with her daughter for a few months before getting her own apartment.  AR 56.  O'Connell reported in June 2015 (during a consultative examination for the Social Security Administration) that she had been hired at a fast food restaurant prior to the stabbing, but she never started working there because of the assault.  AR 763.

O'Connell filed applications for DI and SSI benefits on April 19, 2015, alleging disability beginning March 23, 2015, based on depression, anxiety, and fear.  AR 87, 102.  Her applications were denied initially in November 2015 and upon reconsideration in February 2016.  AR 87-154.  In connection with those reviews, state agency medical consultants John May, MD, and Rene Staudacher, DO, evaluated O'Connell's physical RFC (in September 2015 and February 2016, respectively); and state agency

---

[2] For a more thorough overview, see the Joint Statement of Facts (Doc. 12).

[3] "AR" refers to the administrative record below.

psychological consultants Mark Becker, PhD, and Myrna Tashner, EdD, evaluated her mental RFC (in November 2015 and February 2016, respectively). AR 94-99, 129-34.

At O'Connell's request, the ALJ held an administrative hearing on September 6, 2017. AR 26, 49-51. Both O'Connell and VE Jeff Johnson testified at the hearing. AR 50. On December 13, 2017, the ALJ issued a written decision following the familiar five-step process outlined in the regulations[4] to determine O'Connell was not disabled during the relevant period (March 23, 2015 through December 13, 2017). AR 26-42. The ALJ determined that O'Connell suffered from the following severe impairments: history of multiple stab wounds, obesity, major depressive disorder, anxiety, post-traumatic stress disorder (PTSD), dependent personality disorder, and history of substance abuse. AR 28-29. To determine O'Connell's ability to perform past work (at step four) and other work (at step five), the ALJ determined O'Connell had the following RFC[5]:

- Ability to perform light work.[6]
- Occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes or scaffolds.
- Frequently handle, finger and feel bilaterally.

---

[4] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)**. The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004)).

[5] RFC is "'what the claimant can still do' despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (quoting *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987)).

[6] Light work requires the ability to lift, carry, push and/or pull 20 pounds occasionally and 10 pounds frequently, and to stand, walk, and sit approximately six hours in an eight-hour day. **20 C.F.R. §§ 404.1567(b), 416.967(b)**; **Social Security Ruling (SSR) 96-9p**, 61 Fed. Reg. 34478, 34482 (July 2, 1996).

- Limitation to simple routine tasks without a fast pace or strict quotas.
- Limitation to occasional interaction with coworkers and supervisors and no work-related interaction with the public.
- Ability to adapt to simple changes in a work setting.

AR 30.[7] In making this determination, the ALJ considered O'Connell's testimony and the medical-opinion evidence, among other things. AR 37-40. The ALJ assigned partial weight to the opinion of one-time consultative examiner, Christine Guevara, PhD, (AR 760-64); little weight to the opinion of O'Connell's treating therapist, Carol Ogea, LISW (Therapist Ogea) (AR 326-30, 816, 866); and great weight to the opinions of the state agency medical consultants. AR 36, 38, 40.[8] The ALJ also acknowledged that various providers noted O'Connell's Global Assessment of Functioning (GAF) score in their treatment records on occasion, but the ALJ assigned these scores only partial weight. AR 40; *see also* AR 326 (opinion from Therapist Ogea in December 2015 noting that O'Connell's current GAF score was 47 and her highest GAF score in the past year was 70); AR 770 (O'Connell's psychiatrist noted a GAF score of 50 at O'Connell's first appointment in July 2015); AR 915 (emergency room (ER) provider found a GAF score of 35 during O'Connell's hospitalization for suicidal ideation in April 2017); AR 866 (letter from Therapist Ogea dated May 2, 2017, shortly after O'Connell's release from hospitalization, noted a GAF score of 41).

Based on his determination of O'Connell's RFC and relying on the VE's testimony, the ALJ concluded that O'Connell could not perform her past work. AR 40-

---

[7] Occasionally is a term of art meaning "very little up to one-third" (or two hours) of an eight-hour workday. *See, e.g.*, **SSR 96-9p,** 61 Fed. Reg. at 34480. Frequently means one-third to two-thirds (or six hours) of an eight-hour day. *See, e.g.*, **SSR 83-10**, 1983-1991 Soc. Sec. Rep. 24, at 29-30 (CCH Jan. 1, 1983).

[8] O'Connell argues that the ALJ did "not assess[] any particular weight to her treating psychiatrist Bobitta Nag, MD." Doc. 13 at 24. Although Dr. Nag's treatment notes are in the record (which the ALJ considered), Dr. Nag did not submit an opinion evaluating O'Connell's RFC. The Commissioner's brief points this out, and O'Connell does not offer any response in reply. *See* Doc. 14 at 15; Doc. 15.

41.  The ALJ found, however, that other work existed in significant numbers in the national economy that O'Connell could perform.  AR 41.  The ALJ relied on the VE's testimony that a hypothetical individual with O'Connell's age, education, work experience, and RFC could work as a photocopy operator, marker, and scrap separator, and that respectively, 25,730, 96,140, and 4,790 of those positions existed in the national economy.  AR 41-42, 84.  Thus, the ALJ concluded that O'Connell was not disabled.  AR 42.

On July 19, 2018, the Appeals Council denied O'Connell's request for review (AR 1-4), making the ALJ's decision the final decision of the Commissioner.  *See* **20 C.F.R. §§ 404.981, 416.1481**.  O'Connell filed a timely complaint in this court, seeking judicial review of the Commissioner's decision (Docs. 1, 4).  *See* **20 C.F.R. § 422.210(c)**.  The parties briefed the issues (Docs. 13-15) and consented to the jurisdiction of a United States magistrate judge (Doc. 8).

## II.    DISCUSSION

A court must affirm the Commissioner's decision if it "is supported by substantial evidence in the record as a whole." ***Kirby v. Astrue***, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**.  "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." ***Kirby***, 500 F.3d at 707.  The court "do[es] not reweigh the evidence or review the factual record de novo." ***Naber v. Shalala***, 22 F.3d 186, 188 (8th Cir. 1994).  If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings, [the court] must affirm the decision." ***Robinson v. Sullivan***, 956 F.2d 836, 838 (8th Cir. 1992).

O'Connell argues the ALJ erred by failing to include in the RFC determination several limitations based on her testimony and reports to providers.  O'Connell also argues that the ALJ erred in weighing the medical opinions and that no medical evidence

supports the ALJ's RFC determination. Finally, O'Connell argues the ALJ failed to show that O'Connell could perform other jobs that exist in significant numbers in the national economy. I will address each of these arguments in turn.

### A. Subjective Complaints

When evaluating the credibility of a claimant's subjective complaints—including pain or nervousness—the ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." **Black v. Apfel**, 143 F.3d 383, 386 (8th Cir. 1998); *accord* **Polaski**, 739 F.2d 1320, 1321-22 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *reinstated*,[9] 804 F.2d 456 (8th Cir. 1986). "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." **Black**, 143 F.3d at 386. The ALJ may discount a claimant's subjective complaints that are inconsistent with the objective medical evidence, **Ramirez v. Barnhart**, 292 F.3d 576, 581 (8th Cir. 2002); or "inconsistencies in the record as a whole," **Brockman v. Sullivan**, 987 F.2d 1344, 1346 (8th Cir. 1993). Courts must "defer to an ALJ's credibility finding as long as the 'ALJ explicitly [discounts] a claimant's testimony and gives a good reason for doing so.'" **Schultz v. Astrue**, 479 F.3d 979, 983 (8th Cir. 2007) (quoting **Hogan v. Apfel**, 239 F.3d 958, 962 (8th Cir. 2001)).

O'Connell testified that she suffers constant abdominal pain as a result of the stabbing. AR 62-63. She said that she cannot stand for longer than thirty minutes without her side starting to hurt and that she can lift only "five to ten pounds if [she's] lucky."

---

[9] The court did not explicitly say that it was reinstating the original *Polaski* opinion, but the Eighth Circuit has recognized that it "effectively reinstat[ed]" *Polaski*. **Jones v. Callahan**, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997).

AR 62, 76.  She said she cannot reach above her head with her left arm, and pulling is strenuous on the left side.  AR 64.  She testified that bending is hard and that she cannot squat.  AR 65.  She also testified that she feels depressed every day.  AR 67.  She testified that she is afraid to leave her house; that she does not go outside very often, especially at night; and that it would be difficult for her to work because having to leave her house "would be a big thing."  AR 67, 78.  She testified that she suffers from panic attacks a few times a week.  AR 70-71.  She testified that she sometimes has difficulty handling criticism and following instructions and that her "concentration is horrible."  AR 75-76.

The ALJ did not fully credit O'Connell's subjective complaints.  The ALJ first found that O'Connell's reported limitations were inconsistent with the medical evidence.  AR 32.  The ALJ summarized O'Connell's treatment records.  AR 32-38. Substantial evidence supports the ALJ's conclusion that O'Connell's allegations are inconsistent with those records, which is an appropriate reason to discount a claimant's subjective complaints.

With respect to O'Connell's mental health, treatment records demonstrate that she generally reported improvement in her symptoms of anxiety and depression with medication.  In April 2015, O'Connell told her primary care provider, Vicki Henderson, MD, that the prior month's attack had left her feeling anxious and afraid, and Dr. Henderson prescribed antianxiety medication.  AR 643-46.  She continued to report symptoms of anxiety at her next appointment with Dr. Henderson in May, and Dr. Henderson adjusted her medications and referred her to a psychiatrist.  *See* AR 556-60, 769.  On July 22, 2015, O'Connell had her first appointment with psychiatrist Bobbita Nag, MD, who changed O'Connell's medications based on O'Connell's continued anxiety and depression.  AR 769-70.  At O'Connell's appointments with Dr. Nag over the next year, she reported that medications helped her anxiety and depression, and Dr. Nag noted bright affect and improved mood on objective examination.  *See* AR 772-77 (August 12, 2015:  reported Prozac (fluoxetine) "seems to be helping" her depression

but "still some feelings of hopelessness and helplessness"; "Clonazepam [trade name Klonopin] is not helping too much with . . . anxiety"); AR 820 (September 9, 2015: "reported that the Prozac is helping with her depression," that she had more energy and motivation, that she had an improvement in feelings of hopelessness and helplessness, and that the medications "are working well for her"); AR 822 (October 8, 2015: reported Prozac "helping well with . . . depression," that "[s]he feels like she has more ene[r]gy, more motivation"; and that "she still has some feelings of hopelessness and helplessness but it is much better than before"); AR 824 (December 17, 2015: reported improved depression, feelings of helplessness and hopelessness, energy, and motivation; and that although she still had some bad nightmares, her "flashbacks and hypervigilance has improved from before"); AR 830 (March 22, 2016: reported improved depression and PTSD symptoms; reported some bad nightmares, flashbacks, and hypervigilance, but improvement with flashbacks and hypervigilance). In July 2016, O'Connell reported "feeling depressed a lot recently" and "feeling anxious" after her boyfriend's conviction and impending incarceration for stabbing her. AR 831. She also reported suffering symptoms of severe depression nearly every day in a depression questionnaire completed at an appointment with Dr. Henderson on August 8, 2016, and notes from a social work visit that same day reflect that taking the bus caused such great anxiety that she would not attend her doctor's appointments to avoid the bus. AR 856, 862. At an appointment with Dr. Nag a week later, she reported that her medications were working well and that after being prescribed Effexor (venlafaxine) at her previous appointment, "her depress[ion] seemed to have improved from before" and "[s]he does not have those negative thoughts." AR 833. She also reported increased energy and motivation and improved nightmares and flashbacks. *Id.* At an appointment with Dr. Henderson the next month, O'Connell reported that none of her mental-health medications worked, and Dr. Henderson noted she appeared depressed. AR 847, 849. On October 13, 2016, O'Connell told Dr. Nag that she was "doing much better on current combination of

medications" and that her depression, hopelessness and helplessness, nightmares and flashbacks, PTSD symptoms, and energy and motivation had all improved. AR 834. She next saw Dr. Nag four months later, on February 15, 2017, where she continued to report improved symptoms of depression, but she reported increased anxiety in connection with her upcoming disability hearing. AR 835. In April 2017, O'Connell was hospitalized after she attempted to overdose on pills after getting into an argument with her daughter. AR 901-15.

Although O'Connell testified to suffering from panic attacks a few times a week, the treatment records reflect that she only twice complained of suffering from panic attacks—in April 2015, prior to being prescribed any anxiety medications, and during an increase in anxiety symptoms in February 2017. AR 644, 835. The treatment records generally reflect that O'Connell's anxiety and depression greatly improved with medications (although she still suffered symptoms, which were occasionally exacerbated). *See Rahe v. Astrue*, 840 F. Supp. 2d 1119, 1136-37 (N.D. Iowa 2011) (collecting cases holding that the ALJ may consider a claimant's improvement with treatment in determining the weight to give to a claimant's subjective complaints). Although O'Connell suggests that the ALJ should have assigned more weight to the low GAF scores that appear in the record (Doc. 13 at 27-28; Doc. 15 at 2), the only treatment records that reflect an evaluation of O'Connell's GAF score are from her first appointment with Dr. Nag, prior to her improvement with mental-health medications; and from her hospitalization for suicidal ideation (letters from Therapist Ogea submitted to the Social Security Administration also contain GAF scores, but the ALJ appropriately discounted Therapist Ogea's opinion, as discussed below). The ALJ did not err in failing to assign much weight to two low GAF scores, when the other treatment records generally show an improvement in O'Connell's symptoms with medication.

Similarly, the treatment records show that O'Connell's pain as a result of the stabbing improved with time and treatment. O'Connell underwent surgery on March 23,

2015, and had follow-up appointments to monitor the wound's healing throughout April 2015. AR 380, 410-28, 481, 650-55, 748-50. At an appointment with Dr. Henderson near the end of April 2015, Dr. Henderson noted that O'Connell continued to be "tender to palpation over left flank[ ]area surrounding scar," and O'Connell rated her pain as a 7/10 on the pain scale. AR 556-60. A month later, O'Connell continued to rate her pain at a 7/10 on the pain scale, but she stated it was "[a]ll over her body" (not localized to her stab wound), and Dr. Henderson noted her wound was healing and O'Connell reported "feeling well." AR 643-46. At O'Connell's next appointment with Dr. Henderson on August 24, 2015, O'Connell told Dr. Henderson that she was out of pain medications and her pain had returned, in her mid-abdomen on both sides of her scar. AR 551-54. Dr. Henderson noted that O'Connell's scars had healed well, that they were mildly tender, and that a computed tomography (CT) scan was normal and showed no reason for abdominal pain. AR 554. O'Connell requested pain medications, which Dr. Henderson prescribed. *Id.* Dr. Henderson referred O'Connell to physical therapy. *See* AR 783. O'Connell went to one physical therapy appointment but missed her follow-up appointments; she told Dr. Henderson at an appointment on September 9, 2015, that she missed the follow-up appointments due to illness, and she requested another referral. AR 783-85, 801. At that same appointment, she reported that her pain was somewhat better since starting gabapentin at her last appointment, and Dr. Henderson noted no tenderness on objective examination of O'Connell's abdomen. AR 801, 803. O'Connell stated she did not want to be on additional medications, so Dr. Henderson increased O'Connell's gabapentin dosage and referred her (again) to physical therapy. AR 801, 803, 808. O'Connell went to one physical therapy appointment on September 23, 2015, but she missed her next appointment without calling. AR 808-10, 813. Treatment records do not reflect that O'Connell sought treatment for pain or otherwise complained of pain for almost a year (except she reported to her psychiatrist in October 2015 that "she still has some chronic pain in her abdomen" but she was working with Dr. Henderson "regarding

10

that"). AR 822. On August 8, 2016, O'Connell told Dr. Henderson that she had stopped taking gabapentin six months ago because it did not help, and she reported suffering daily pain along her left back and abdomen. AR 857. On objective examination, Dr. Henderson noted tenderness near O'Connell's scar on her back, but not on her abdomen. AR 858-59. Dr. Henderson restarted O'Connell on gabapentin. AR 860. The next month, O'Connell saw Dr. Henderson for ear pain and reported that gabapentin did not help her pain. AR 846-50. A few months later, O'Connell had an appointment with Dr. Henderson due to an ear infection and suffering neck pain for the past two days. AR 841-45. The treatment note does not reflect that she complained of pain near her stab wound, although Dr. Henderson noted that O'Connell's left back was tender to palpation. *Id.* No other treatment records reflect that O'Connell sought treatment for or complained of pain, and during her hospitalization for suicidal ideation in April 2017, providers noted minimal abdominal tenderness on palpation. AR 910.

The ALJ could consider that although O'Connell testified to suffering from constant pain as the result of the stabbing, treatment records reflect that she rarely complained of such pain after her wound had healed for about six months. *See also Robinson*, 956 F.2d at 840 (holding that ALJ "could conclude that [claimant's] treatment history . . . contradict[ed] his claims of disabling [neck] pain" caused by a workplace accident when the record showed large gaps in time when claimant did not seek treatment for neck pain or complain of neck pain during medical appointments for other ailments; providers "prescribed conservative treatment, including physical therapy, muscle relaxants, heat and sound treatments, and pain relievers," and claimant did not seek "more aggressive treatment"; and claimant reported medications helped pain somewhat but did not take them regularly). Substantial evidence supports the ALJ's determination that O'Connell's complaints of constant, disabling pain are inconsistent with the conservative treatment she received for pain.

The ALJ also found that O'Connell's activities of daily living were inconsistent with her complaints of disabling limitations. Aside from living with her daughter for a few months following the stabbing, O'Connell lived by herself in an apartment. AR 56. She babysat her grandchildren, who were ages three and one, a couple times a week in 2016 and 2017. AR 56, 61, 835 (reported babysitting grandchildren while her daughter worked in February 2017), 914 (reported babysitting her grandchild often in April 2017). She testified that her babysitting was infrequent and "not for long periods of time." AR 60. Although she testified to rarely being able to leave the house and reported that she could only walk one to two blocks at a time, the ALJ noted that she reported grocery shopping once or twice a week for an hour at a time (she reported it took an hour "due to lack of body movement from pain and muscle damage"). AR 39, 289. She also reported walking to the consultative examination in June 2015 as she lived only a few blocks away. AR 762. O'Connell stated that she visited friends and went to birthday parties about three times a month. AR 290. The ALJ also noted that O'Connell reported being able to make sandwiches, frozen pizzas, and canned soup; do a small number of dishes; and pick up and put away lightweight items (but she reported she needed help vacuuming, mopping, sweeping, and putting away heavier items). AR 288. The ALJ also noted that O'Connell reported enjoying reading, writing in her journal, sewing, taking long walks, hanging out with her friends, listening to music, and watching movies, although she stated she did not do these activities very often due to depression and anxiety. AR 290. Substantial evidence supports the ALJ's determination that O'Connell's activities of daily living are inconsistent with her subjective complaints of disabling physical and mental limitations. *See Milam v. Colvin*, 794 F.3d 978, 982, 984-85 (8th Cir. 2015) (ability to cook, do laundry, take care of personal hygiene, and shop for groceries, "particularly when considered in conjunction with the medical records"— which showed a conservative treatment history, normal objective test results, and a failure

to seek treatment for long periods—supported the ALJ's decision to not fully credit claimant's subjective complaints).

The ALJ also took note of the fact that O'Connell "stopped working for reasons not related to the allegedly disabling impairments." AR 39. The ALJ could appropriately consider this factor when determining whether to fully credit O'Connell's subjective complaints. *See Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001).

"Subjective complaints may be discounted if the claimant's testimony is inconsistent with the evidence as a whole." *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1090 (8th Cir. 2018). "[T]he ALJ may discount subjective complaints of physical and mental health problems that are inconsistent with medical reports, daily activities, and other such evidence." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003) (quoting *Gwathney v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997)). Here, the ALJ gave good reasons supported by substantial evidence for failing to fully credit O'Connell's subjective complaints.

### B. Medical Opinions

O'Connell challenges the ALJ's decision to assign greater weight to the opinions of the state agency consultants than to the opinions of the one-time consultative examiner and her treating therapist. When determining a claimant's RFC, the ALJ considers medical opinions "together with the rest of the relevant evidence." **20 C.F.R. §§ 404.1527(b), 416.927(b)**. The ALJ considers the following factors to determine the weight to assign any opinion assessing a claimant's RFC:

> (1) whether the source has examined the claimant; (2) the length, nature, and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion."

*Owen v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008) (quoting the current **20 C.F.R. §§ 404.1527(c), 416.927(c)**).

O'Connell met with Dr. Guevara for a one-time psychological consultative examination on June 17, 2015. AR 760. Shortly thereafter, Dr. Guevara issued an opinion evaluating O'Connell's RFC. AR 760-64. Dr. Guevara opined that O'Connell suffered no limitations in understanding instructions, procedures, and locations. AR 764. She opined that O'Connell suffered mild to moderate impairment in carrying out instructions and maintaining concentration and pace, noting that she "struggled with some cognitive tasks due to her concentration and attention" and that she had difficulty getting out of bed when depressed. *Id.* She found O'Connell had moderate to severe impairment in responding well to supervision in the work place, noting that O'Connell was "emotionally fragile and not able to work" and that she was "likely to break down crying at her post." *Id.* She also opined that O'Connell suffered severe impairment in using good judgment consistently and responding appropriately to changes in the work place, noting that O'Connell had poor boundaries with her family and trouble making her own decisions and would need a third-party payee to manage benefits if awarded. *Id.*

The ALJ assigned partial weight to Dr. Guevara's opinion. AR 36. The ALJ noted that Dr. Guevara's opinion regarding O'Connell's ability to understand and carry out instructions, maintain concentration and pace, and respond to supervision in the workplace "were consistent with the [RFC] assigned in this case." AR 36. The ALJ discounted Dr. Guevara's opinion regarding O'Connell's ability to exercise good judgment, noting that O'Connell's poor life choices did not demonstrate that she could not "make appropriate choices in a structured, simple, repetitive environment," and that O'Connell had a lengthy work history and her last job ended "due to staff cuts, not performance issues." AR 36.

O'Connell argues that the ALJ should have credited Dr. Guevara's statement that O'Connell is emotionally fragile and not able to work. But a source's overall conclusion

that a claimant is disabled does not constitute a medical opinion, and the ALJ is not required to give such a conclusion any weight. *See* **20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1)**. O'Connell also argues that the ALJ should have credited Dr. Guevara's statement that O'Connell has difficulty getting out of bed when depressed and that she is likely to break down crying. Doc. 13 at 28. But these statements, although in the conclusion section of Dr. Guevara's opinion, were not Dr. Guevara's opinion, but rather, O'Connell's statements to Dr. Guevara, and were included as evidence supporting Dr. Guevara's ultimate finding of mild to moderate impairment in concentrating and pace and moderate to severe impairment in responding to supervision in the work place. AR 764. Finally, O'Connell challenges the ALJ's rejection of Dr. Guevara's opinion that O'Connell suffers severe limitations in her ability to use good judgment in the workplace. Doc. 13 at 28. Contrary to O'Connell's argument otherwise, the ALJ could appropriately consider that the basis for Dr. Guevara's statement appeared to be O'Connell's questionable life choices, which did not necessarily bear on her ability to function at work. The ALJ gave good reasons for the weight assigned to Dr. Guevara's opinion, and the ALJ's overall discussion of O'Connell's RFC (including the ALJ's reasons for discrediting O'Connell's subjective complaints) supports the ALJ's rejection of some of Dr. Guevara's opined limitations.

O'Connell also challenges the weight the ALJ assigned to Therapist Ogea's opinion. O'Connell began therapy with Therapist Ogea on July 1, 2015, seeing her one to two days per week. AR 330, 816. Therapist Ogea's treatment notes are not in the record, but she submitted letters dated October 23, 2015, and May 2, 2017, and an RFC opinion dated December 23, 2015. AR 326-30, 816, 866. Therapist Ogea opined that O'Connell suffered slight limitations in her ability to remember work-like procedures and slight to moderate limitations in her ability to understand, remember, and carry out short and simple instructions, explaining: "Client unable to understand and remember directions. Carrying out task is connected to her mood, motivation, pain and energy

level not on her memory." AR 327. Therapist Ogea opined that O'Connell suffered slight to moderate limitations in her ability to make simple work-related decisions; moderate to marked limitations in her ability to maintain attention for two hour segments, sustain an ordinary routine without special supervision, complete a normal workday and workweek without interruptions from medically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods; and marked limitations in her ability to maintain regular attendance and be punctual, and her ability to work in coordination with or proximity to others without being unduly distracted by them. AR 328. She explained the basis for these limitations:

> Client's ability is variable as she continues to be symptomatic. Improved days do not necessarily mean for an extended period of time. The client has intermittent panic and anxiety that interferes with her attention, ability to tolerate being around others, [and] maintaining herself in an environment[,] and she is distracted by events or precipitated . . . events around her.

*Id*. Therapist Ogea also opined that O'Connell suffered slight limitations in her ability to ask simple questions or request assistance; moderate limitations in her ability to get along with coworkers or peers without unduly distracting them or exhibiting behavioral problems; and moderate to marked limitations in her ability to accept instructions and respond appropriately to criticism from supervisors, and in her ability to maintain socially appropriate behavior and adhere to basic standards of neatness. AR 329. She explained: "Again, in a predictable, safe, low stimulation environment[,] the client can do better. If triggered[,] upset[,] or fearful[,] she has or can become tearful, emotionally intense, verbally aggressive, verbally loud[,] and will retreat." *Id*.

The ALJ assigned little weight to Therapist Ogea's evaluation of O'Connell's RFC. AR 38. The ALJ noted that as a licensed social worker, Therapist Ogea is not an acceptable medical source under the regulations (but an ALJ must still evaluate nonacceptable source's opinions using the same factors as an acceptable medical source's opinions). *See* **20 C.F.R. §§ 404.1502(a), 404.1527(a), (f), 416.902(a), 416.927(a),**

**(f)**.   The ALJ noted that Therapist Ogea's RFC opinion was conclusory and provided little explanation of the evidence relied upon in forming that opinion (and her treatment notes are not in the record).  AR 38.  The ALJ further noted that Dr. Nag's treatment notes demonstrate that O'Connell's depression and anxiety improved with medication and suggested that the limitations found by Therapist Ogea were inconsistent with O'Connell's activities of daily living.  *Id*.

O'Connell argues that the ALJ erred in discounting Therapist Ogea's opinions because the limitations she found are consistent with the treatment records of Dr. Nag and Dr. Henderson.  *See* Doc. 13 at 30.  But as discussed in the preceding section on credibility, substantial evidence supports the ALJ's finding that the treatment records show O'Connell's mental health improved with medication.  O'Connell's activities of daily living are also inconsistent with many of the marked limitations found by Therapist Ogea.  The ALJ could discount Therapist Ogea's opinion based on inconsistency with the treatment records and O'Connell's activities of daily living.  The ALJ did not err in assigning Therapist Ogea's opinion little weight.  *See Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (ALJ may consider whether a claimant's "daily activities belie the physical limitations contained in a [treating physician's] evaluation" when determining the weight to assign that evaluation); *Hamilton v. Astrue*, 518 F.3d 607, 610-11 (8th Cir. 2008) (inconsistencies with treatment notes provide a good reason to not give a treating physician's opinion controlling weight).

When the ALJ gives a good reason for discounting a treating or examining source's opinion, the ALJ may "rely instead on the opinions of the state agency medical consultants," as long as those opinions are "more consistent with the medical evidence." *Vance v. Berryhill*, 860 F.3d 1114, 1121 (8th Cir. 2017).  The ALJ's discussion of the treatment records and other evidence in his discussion of O'Connell's RFC supports his finding that the state agency consultants' opinion were more consistent with the evidence

of record. Substantial evidence supports the ALJ's determination to assign more weight to the opinions of the state agency consultants.

### C. Some Medical Evidence

When determining a claimant's RFC, the ALJ must consider "all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). The ALJ's RFC determination must be supported by at least some medical evidence from a medical professional that "addresses the claimant's ability to function in the workplace." *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).

O'Connell argues that medical opinions from nonexamining state agency consultants cannot constitute some medical evidence supporting the ALJ's opinion. O'Connell relies on *Nevland v. Apfel*, 204 F.3d 853 (8th Cir. 2000); *Strongson v. Barnhart*, 361 F.3d 1066 (8th Cir. 2004); *Anderson v. Shalala*, 51 F.3d 777 (8th Cir. 1995); *Frankl v. Shalala*, 47 F.3d 935 (8th Cir. 1995); and *Richmond v. Berryhill*, No. 16-CV-140-LRR, 2017 WL 4074633, at *3 (N.D. Iowa Sept. 14, 2017) (adopting report and recommendation). None of these cases support O'Connell's position.

In *Nevland*, the Eighth Circuit held that "the ALJ should have sought . . . an opinion from [claimant's] treating physicians or, in the alternative, ordered consultative examinations," rather than "rel[y] on the opinions of non-treating, non-examining physicians . . . to form an opinion of [claimant's] RFC" when numerous treatment notes "establishe[d] that [claimant] suffer[ed] from . . . impairments which prevent him from performing his past relevant work" but not how those impairments "affect his [RFC] to do other work." 204 F.3d at 857-58. Here, however, unlike in *Nevland*, an opinion from a psychological consultative examiner is in the record, and the ALJ adopted many of the mental limitations found by the consultative examiner. *Cf. Strongson*, 361 F.3d

at 1071-72 (characterizing *Nevland* as holding that the ALJ has a duty to ensure that the record contains "evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue" and holding that the ALJ did not err in failing to obtain treatment notes or an RFC opinion from claimant's treating therapist when the record contained treatment records and an RFC opinion from the claimant's treating psychiatrist, which the ALJ assigned little weight; and the opinion of a consultative examiner). As the Eighth Circuit held in *Anderson* (a case relied upon by O'Connell), "the opinion of a reviewing physician" in combination with "an independent analysis of the medical evidence" may constitute some medical evidence supporting the ALJ's RFC determination. 51 F.3d at 779; *see Kamann v. Colvin*, 721 F.3d 945, 948-51 (8th Cir. 2013) (rejecting claimant's argument that the ALJ "formulated his own medical opinion" when the ALJ rejected the RFC opinion of the one-time examining psychologist and instead relied on a "thorough[] review[] [of] years of medical evidence on record" to formulate an opinion "consistent with the views of . . . the reviewing agency psychologist"); *Stormo v. Barnhart*, 377 F.3d 801, 806-807 (8th Cir. 2004) (finding some medical evidence supported the ALJ's physical RFC determination when it was consistent with the state agency medical consultants' opinions, and at least one treating physician's physical RFC opinion was in the record but assigned non-controlling weight); *see also Krogmeier v. Barnhart*, 294 F.3d 1019, 1023-24 (8th Cir. 2002) (holding that substantial evidence supported the ALJ's RFC determination when he rejected the treating source's RFC opinion and relied on the opinion of a consultative examiner and an independent review of the medical evidence, including the treating physician's treatment notes). Here, some medical evidence supports the ALJ's mental RFC determination: an opinion from a consultative examiner was in the record but assigned partial weight; and the ALJ relied upon the opinions of the state agency consultants and an independent review of the medical evidence. As there is no evidence that O'Connell's mental health deteriorated from the time of the state agency review to

the time of the hearing (in fact, the treatment records support the ALJ's conclusion that it improved), the ALJ could rely upon the state agency consultants' opinions. *Cf. Frankl*, 47 F.3d at 937-39.

With regard to O'Connell's physical RFC, no opinion from a treating or examining source was in the record. *Nevland* does not require the ALJ obtain an RFC opinion from a treating or examining source when "other medical evidence in the record"—such as treatment notes—"clearly establishes a claimant's RFC to do other work[] and to function in the workplace." *Kruger v. Colvin*, No. C13-3036-MWB, 2014 WL 1584411, at *10 (N.D. Iowa Apr. 21, 2014), *report and recommendation adopted by* 2014 WL 2884038 (N.D. Iowa June 25, 2014); *see also Richmond*, 2017 WL 4074633, at *3 ("[A]n ALJ does not need additional clarifying statements from a treating physician "as long as the records describe the claimant's 'functional limitations with sufficient generalized clarity to allow for an understanding of how those limitations function in a work environment."); *Becherer v. Colvin*, No. 4:12CV2356 ACL, 2014 WL 4230906, at *13 (E.D. Mo. Aug. 26, 2014) (noting that the claimant in *Nevland* "provided medical evidence that documented his limited functional capabilities" and holding that remand is not required when "no medical evidence in the record support[s] any greater limitations than those found by the ALJ"); *Symens v. Colvin*, No. CIV 13-3006-RAL, 2014 WL 843260, at *26 (D.S.D. Mar. 4, 2014) (holding that remand is not required under *Nevland* when "the ALJ engaged in an extensive review of the medical evidence. . . . [that] supported the ALJ's" RFC and "was also consistent with the reports from the" nonexamining state agency consultants); *Knight v. Astrue*, No. 12-06004-CV-SJ-NKL-SSA, 2012 WL 4092356, at *7 (W.D. Mo. Sept. 17, 2012) ("*Nevland* stands for the proposition that, where the claimant's alleged RFC is otherwise supported by substantial evidence in the record, the ALJ may not rely solely on the opinions of non-examining sources in rejecting the alleged RFC."). "The ultimate question . . . is whether a critical issue was underdeveloped . . . such that the ALJ's decision was not supported by substantial

evidence." *Kruger*, 2014 WL 2884038, at *2; *see also* **20 C.F.R. §§ 404.1519a(b), 416.919a(b)** (Social Security Administration may purchase a consultative examination "to try to resolve an inconsistency in the evidence" or "when the evidence as a whole is insufficient" to resolve the claim).

Here, the only physical impairments the ALJ found O'Connell suffered were a history of multiple stab wounds and obesity. The medical evidence of record does not support a greater RFC determination than found by the ALJ, and the ALJ could rely upon the treatment records, O'Connell's activities of daily living, and the opinions of the state agency consultants in determining O'Connell could perform light work with additional restrictions. *Cf. Richmond*, 2017 WL 4074633, at *4. The ALJ did not err in failing to order a physical consultative examination.

Substantial evidence, including some medical evidence, supports the ALJ's RFC determination.

### D. Step-Five Determination

Once the ALJ determines that the claimant cannot perform her past work, the ALJ evaluates at step five whether the claimant can perform other work that "exist[s] in significant numbers in the national economy (either in the region where [the claimant] live[s] or in several regions in the country)." **20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1)**. The Commissioner bears the burden of proving that jobs exist in significant numbers that someone with the claimant's age, education, work experience, and RFC can perform. *See Gieseke v. Colvin*, 770 F.3d. 1186, 1189 (8th Cir. 2014); **20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2)**. The Commissioner may meet this burden through testimony by a VE, but "VE testimony that conflicts with the [Dictionary of Occupation Titles (DOT)] 'does not constitute substantial evidence upon which the Commissioner may rely to meet [its] burden" if the inconsistency is unexplained by the VE. *Moore v. Colvin*, 769 F.3d 987, 990 (8th Cir. 2014).

> Under [SSR] 00-4p, the ALJ must "ask about any possible conflict" between VE evidence and "information provided in the DOT." . . . If there is an "apparent unresolved conflict" between VE testimony and the DOT, the ALJ must "elicit a reasonable explanation for the conflict" and "resolve the conflict by determining if the explanation given [by the expert] provides a basis for relying on the [VE] testimony rather than on the DOT information."

*Id.* at 989-90 (alterations in original) (quoting **SSR 00-4p**, 65 Fed. Reg. 75759, 75760 (Dec. 4, 2000)).

The VE testified that jobs existed for a hypothetical individual with O'Connell's RFC, age, education, and work experience, "[e]xamples being a photocopy operator, with 25,730 positions in the national economy; "[a] marker, . . . with 96,140 positions" in the national economy; and "[a] scrap separator," with 4,790 positions in the national economy. AR 83-84. The VE listed the DOT number for the photocopy operator position (207.685-014) and the scrap separator position (529.587-018) but did not list the full DOT number for the marker position (the VE's testimony is reflected in the transcript as "207.034-"). AR 84. The VE testified that those positions were just "samples" of work O'Connell could perform. *Id.* The VE also testified that his testimony was consistent with the DOT. *Id.* Relying on the VE's testimony, the ALJ found that other work existed in significant numbers that O'Connell could perform and that "representative . . . occupations" included the three positions identified by the VE. AR 42. The ALJ listed the DOT number for the marker position as 203-787.034. AR 42.

O'Connell argues that the VE's testimony that she could work as a scrap separator is inconsistent with the DOT and that the ALJ erred in failing to resolve this conflict. The ALJ found that O'Connell could only occasionally stoop, kneel, and crouch (AR 30), but as O'Connell points out, according to the DOT, working as a scrap separator requires frequent stooping, kneeling, and crouching. **DOT § 529.587-018**. The Commissioner acknowledges that the ALJ failed to resolve this conflict between the VE's testimony and the DOT but argues that the error was harmless because the VE's testimony regarding

the other two positions, standing alone, establishes that a significant number of positions exist for O'Connell to perform. Doc. 14 at 9-10.

O'Connell also challenges the ALJ's finding that she could work as a marker, noting that neither the ALJ nor the VE listed the correct DOT number for the position: the VE gave an incomplete DOT number ("207.034-") (and no DOT position begins with those numbers), and the ALJ listed a nonexistent DOT number (203.787-034). AR 42, 84. The DOT contains several positions titled marker: marker, DOT § 209.587-034; marker, DOT § 369.687-026; marker, DOT § 652.582-010; marker I, DOT § 781.384-014; marker, DOT § 781.687-042; and marker II, 920.687-126.[10] I agree with the Commissioner that it seems clear that the ALJ and the VE were referring to the marker position listed at DOT § 209.587-034: the number listed by the ALJ differs by only two digits (20<u>3</u>.<u>7</u>87-034 as opposed to 20<u>9</u>.<u>5</u>87-034), and the partial number listed by the VE differs by only one (20<u>7</u>.___-034) (or perhaps none, if the VE's testimony is written as 20_.__7-034)). None of the other marker positions in the DOT have DOT numbers resembling those cited by the ALJ and VE. When it can be determined which position in the DOT the VE and ALJ were referring to, a scrivener's error in the DOT number does not require that the court eliminate that position from consideration. *See Davis v. Berryhill*, 743 F. App'x 846, 849-50 (9th Cir. 2018) (holding that substantial evidence supported step-five finding when the VE identified three jobs claimant could perform; VE's testimony regarding two of those positions was inconsistent with the DOT; VE and ALJ listed the incorrect DOT number for the remaining position, which the VE testified had a specific vocational level (SVP) of two, but a job with the same title was listed at a DOT number "one digit different from the number the [VE and ALJ] cited" and had an

---

[10] There are also many other positions in the DOT that contain marker in the title. *See, e.g.*, **DOT § 761.684-022** (pattern marker II); **DOT § 788.584-014** (hand marker); **DOT § 690.685-282** (machine marker); **DOT § 764.687-030** (barrel marker); **DOT § 529.567-014** (company marker); **DOT § 732.381-014** (bowling ball grader and marker); **DOT § 229.587-010** (greige-goods marker); **DOT § 455.687-010** (log marker).

SVP level of two; and that remaining position, standing alone, existed in significant numbers in the national economy). The DOT description of the marker position listed at § 209.587-034 does not exceed O'Connell's RFC. Although the ALJ and VE erred in listing a nonexistent, incorrect DOT number for the marker position, this error was harmless because the correct DOT position can be determined with reasonable certainty. Thus, I find that the VE's testimony regarding the marker position can be considered in determining whether substantial evidence supports the ALJ's step-five finding.

O'Connell also challenges the ALJ's reliance on the remaining position identified by the VE—photocopy operator. O'Connell does not argue that the VE's testimony conflicted with the DOT regarding this position. Rather, O'Connell argues the job description for photocopy operator was last updated in 1977 and "appears to barely exist in practice today in the form described in" the DOT. Doc. 13 at 16. O'Connell cites no evidence to call the VE's testimony into question that 25,730 photocopy operator positions exist nationally. O'Connell points to an Eighth Circuit case in which the ALJ found the claimant could work as an addresser, but the court held that no evidence existed in the record that the claimant possessed certain skills listed by the DOT as necessary to perform work as an addresser; and in a footnote, the court further noted "the requirements for this job category were last determined in 1977," and "[g]iven the widespread use of computers today for elementary clerical tasks, basic computer knowledge may also be required to perform effectively at this position." *Titus v. Callahan*, 133 F.3d 561, 563 & n.2 (8th Cir. 1997). In *Titus*, the Eighth Circuit relied on an actual conflict between the DOT requirements and the claimant's RFC; no such conflict is present here.

I note that the Sixth Circuit has called into question an ALJ's reliance on an outdated DOT description of a position when that position is not listed in the Occupational Information Network (O*NET), the Department of Labor's more current database. *See Cunningham v. Astrue*, 360 F. App'x 606, 616 (6th Cir. 2010). But here, the photocopy

operator position is listed in the O*NET—it is grouped with five other DOT positions as "Office Machine Operators, Except Computer," 60,000 positions of which existed as of 2016 (according to the O*NET).[11] The ALJ did not err in relying on the VE's testimony that O'Connell could work as a photocopy operator.

District courts in the Eighth Circuit (including in the Northern District of Iowa) have held that an inconsistency between the VE's testimony and the DOT is harmless if at least one job remains the claimant can perform that is consistent with the DOT, and the VE's testimony establishes that this job exists in significant numbers in the national economy. *See, e.g.*, *Howes v. Colvin*, No. C14-4067-MWB, 2015 WL 5011973, at *11 (N.D. Iowa Aug. 24, 2015), *report and recommendation adopted*, 2015 WL 5472942 (Sept. 16, 2015); *Nowden v. Astrue*, No. 5:10CV00270 JLH, 2012 WL 370101, at *5 (E.D. Ark. Feb. 6, 2012); *cf. Grable v. Colvin*, 770 F.3d 1196, 1202 (8th Cir. 2014) ("An ALJ may rely on a vocational expert's testimony as long as some of the identified jobs satisfy the claimant's [RFC].").  Here, although the ALJ erred in relying on the VE's testimony that O'Connell could work as a scrap separator without resolving the inconsistency with the DOT, the error was harmless.  Even considering only the marker and photocopy operator positions, the VE's testimony establishes that 121,870 positions exist nationally that O'Connell can perform, which is a significant number.[12]  *See, e.g.*, *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 529 (9th Cir. 2014) (holding that 25,000 positions nationally constituted a significant number).  Accordingly, substantial evidence supports the ALJ's step-five determination.

---

[11] **Custom Report for 43-9071.00 – Office Machine Operators, Except Computer**, O*NET, https://www.onetonline.org/link/summary/43-9071.00 (from "Custom" tab, check "Crosswalk" and select "all" and "DOT" from the Crosswalk drop-down menus; and check "Wages & Employment"; then follow "Go" hyperlink).

[12] O'Connell does not argue that the Commissioner cannot meet the step-five burden through the use of national numbers standing alone without regional numbers.

### III.  CONCLUSION

I **affirm** the Commissioner's decision.  Judgment shall enter in favor of the Commissioner.

**IT IS SO ORDERED** this 30th day of September, 2019.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa